IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RONALD BROOK,

    Plaintiff,                        No. CIV S-09-1364 GEB CKD P

    vs.

V. SINGH[1], et al.,                  ORDER AND

    Defendant.                 FINDINGS & RECOMMENDATIONS

_____/

I. Introduction

        Plaintiff, a state prisoner proceeding pro se, has filed this civil rights action seeking relief under 42 U.S.C. § 1983. This case proceeds on the original complaint filed May 15, 2009. (Dkt. No. 1 ("Cmplt.").) Plaintiff alleges First Amendment-based retaliation claims against defendants Miles, Herrera, Singh and Cappel. Plaintiff's motion for partial summary judgment was denied on August 1, 2011. Pending before the court is defendants' April 11, 2011 motion for summary judgment. (Dkt. No. 48-1 ("Mtn.").) Plaintiff has filed an opposition (Dkt. No. 49 ("Opp."), and defendants have filed a reply (Dkt. No 50). For the following reasons, the undersigned will recommend that defendants' motion be denied.

---

[1] While plaintiff names a defendant "Sing" in his complaint, defendants identify this defendant as "Singh."

II. Summary Judgment Standards Under Rule 56

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party

1  must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome
2  of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
3  (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.
4  1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could
5  return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,
6  1436 (9th Cir. 1987).

7  In the endeavor to establish the existence of a factual dispute, the opposing party
8  need not establish a material issue of fact conclusively in its favor. It is sufficient that "the
9  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing
10 versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary
11 judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a
12 genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory
13 committee's note on 1963 amendments).

14 In resolving the summary judgment motion, the court examines the pleadings,
15 depositions, answers to interrogatories, and admissions on file, together with the affidavits, if
16 any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson,
17 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the
18 court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587.
19 Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to
20 produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen
21 Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.
22 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply
23 show that there is some metaphysical doubt as to the material facts . . . . Where the record taken
24 as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no
25 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).
26 \\\\\

On November 4, 2009, the court advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), cert. denied, 527 U.S. 1035 (1999), and Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

III. Discussion

    A. Legal Standard

Plaintiff alleges that defendants retaliated against plaintiff because plaintiff filed a grievance in October 2006 and was engaged in a lawsuit against the prison.[2] To establish a First Amendment retaliation claim, plaintiff must show: (1) an adverse action against him; (2) because of; (3) his protected conduct, and that such action; (4) chilled his exercise of his First Amendment rights; and (5) the action did not reasonably advance a legitimate correctional goal. Rhodes v. Robinson, 408 F.3d 559, 567–68 (9th Cir. 2005). Prisoners alleging retaliation claims must demonstrate that: (1) prison officials retaliated against them for exercising their constitutional rights; and (2) the retaliation did not advance legitimate penological interests, such as the preservation of institutional order, discipline, and security. Barnett v. Centoni, 31 F.3d 813, 316 (9th Cir. 1994). Even if an inmate shows that the defendants' action was retaliatory, the inmate's retaliation claim still fails unless he produces significant probative evidence demonstrating that the retaliatory action did not advance a legitimate penological interest. Id. at 815–16. "The plaintiff bears the burden of pleading and proving the absence of legitimate correctional goals for the [retaliatory] conduct [at issue]." Pratt v. Rowland, 65 F.3d 802, 806 (9th Cir. 1995).

While the prisoner must allege a defendant's actions caused him some injury, Resnick v. Hayes, 213 F.3d 443, 449 (9th Cir. 2000), the prisoner need not demonstrate a total

---

[2] At the time of these events, plaintiff was involved in the litigation of Ronald D. Brook v. Tom L. Carey, Warden, e. al., United States District Court, CIV S-04-1254 EJG GGH P. According to the docket, that case was closed on November 6, 2009.

chilling of his First Amendment rights in order to establish a retaliation claim. See Rhodes, 408 F.3d at 568–69 (rejecting argument that inmate did not state a claim for relief because he had been able to file inmate grievances and a lawsuit). That a prisoner's First Amendment rights were chilled, though not necessarily silenced, is enough. Id. at 569 (destruction of inmate's property and assaults on inmate enough to chill inmate's First Amendment rights and state retaliation claim, even if inmate filed grievances and a lawsuit).

Retaliatory motive may be shown by the timing of the allegedly retaliatory act and inconsistency with previous actions, as well as direct evidence. Bruce v. Ylst, 351 F.3d 1283, 1288–89 (9th Cir. 2003). However, retaliation claims brought by prisoners must be evaluated in light of concerns over "excessive judicial involvement in day-to-day prison management, which 'often squander[s] judicial resources with little offsetting benefit to anyone.'" Pratt, 65 F.3d at 807 (quoting Sandin v. Conner, 515 U.S. 472, 482 (1995)).

B. Factual Background

At all times relevant to this action, plaintiff was a Close-B custody inmate at California State Prison-Solano (CSP-Solano). Defendants were employed at CSP-Solano as follows: Miles as a Custody Captain, Herrera as a Correctional Lieutenant, Cappel as Facility Captain, and Singh as Associate Warden. (Mtn. at 2; Opp. at 28 (undisputed facts[3]).)

1. Defendants Miles and Herrera

In September 2006, plaintiff applied for acceptance to a self-help program called the Offender Employment Continuum (OEC) class. This request was denied. (Cmplt. at 2.)[4] On October 13, 2006, plaintiff filed an inmate grievance, again requesting assignment to the OEC class. (Mtn. at 3; Opp. at 33.) Plaintiff stated that he had been working on C-side, where the

---

[3] Citations to undisputed facts in the parties' briefs incorporate references therein to record evidence.

[4] Plaintiff asserts that, on October 11, 2006, the OEC administrator told plaintiff that defendant Herrera denied his request to take the class. (Cmplt. at 2.) Defendants' objection that this is inadmissible hearsay is sustained. (Dkt. No. 49 at 58.)

5

OEC program was located, for nine years; and that for the past four years he had been working in the Prison Industries Authority (PIA) book bindery, housed in the same building as OEC. (Cmplt. at 32 (Ex. 2).) On November 3, 2006, plaintiff's grievance was granted; he was allowed to enroll in the next OEC class as long as he remained approved for C-side clearance. (Id.)

On December 9, 2006, plaintiff was assigned to the OEC class. (Mtn. at 3; Opp. at 33.) One month later, after completing the class, plaintiff was unassigned from the OEC class and reassigned to his job in the book bindery. (Mtn. at 3; Opp. at 33.) It is undisputed that "[a]nytime an inmate was approved for assignment, or reassignment, to a job on C-side, Defendant Miles would review the inmate's central file to ensure that granting that inmate C-side clearance would not create an escape risk." (Dkt. No. 48-2; Opp. at 32-33.) Before allowing plaintiff to return to his job in the book bindery, defendant Miles reviewed plaintiff's central file. (Mtn. at 3; Opp. at 33-34.)

Plaintiff's central file indicated that plaintiff had successfully escaped from prison in 1978.[5] (Cmplt. at 43, 49-51 (Ex. 6).) A prison record dated January 17, 2007 and signed by defendant Herrera states: "The Custody Captain [Miles] denied the GATE PASS due to subject's escape history. Please schedule Inmate Brook for ICC/UCC to review Gate Pass eligibility and appropriate Waiting List placement as soon as possible." (Cmplt. at 34 (Ex. 3). Two days later, plaintiff was unassigned from his job in the book bindery because he did not have C-side clearance.[6] (Mtn. at 3; Opp. at 35.)

---

[5] "On April 27, 1978 inmate Brook and inmate Finney escaped from CTF-North. It was later determined that inmate Brook successfully escaped by wearing a Correctional Officer's uniform which was stolen from the Staff Dry Cleaning Shop and cutting through the Security Fence behind the CTF-North Maintenance Shop. On July 22, 1983 Brook was apprehended in the State of Tennessee. On March 8, 1984, per Penal Code 4530 inmate Brook plead guilty to escape without force and was sentenced to a term of sixteen (16) months consecutive to his existing term of life." (Cmplt. at 51 (Ex. 6).)

[6] The parties characterize C-side differently. Defendants describe C-side as a "large, open area that is less secure than other areas of the prison" where inmate-workers "have access to tools, and vehicles frequently access C-side, driving in and out of the prison." Thus, "an escape attempt is easier and more likely" from C-side than from other areas of the prison. (Mtn. at 2;

Plaintiff alleges that defendants Herrera and Miles denied him access to C-side in retaliation for plaintiff's past grievances (including his October 2006 inmate appeal of the denial of his request to participate in OEC) and his lawsuit against the prison. (Cmplt. at 6-9.) Plaintiff attaches to the complaint his October 2006 inmate appeal, which was partially granted and signed by a non-defendant correctional officer. (Id. at 32-33 (Ex. 2).)

In his sworn declaration, defendant Miles states that, from November 2006 through 2009, he was unaware of any inmate grievance filed by plaintiff and was never motivated by any of his inmate grievances. (Dkt. No. 48-4.)

Defendant Herrera's sworn declaration does not address whether he was aware of plaintiff's October 2006 grievance, or any other grievance or lawsuit, in January 2007. He merely states that, in his dealings with plaintiff, he was "never motivated by any of [plaintiff's] inmate grievances." (Dkt. No. 48-5.) He further asserts: "My sole motivation for relieving Brook of his assignment to the book bindery . . . was to follow CSP-Solano's operational procedures. As a Correctional Lieutenant, I did not have the authority to approve Close Custody inmates for C side clearance. Rather, I was required to relieve inmate-workers of their jobs on C side if the Custody Captain [Miles] at any time denied them C side clearance, and generate a chrono referring that inmate-worker back to the classification committee for reevaluation." (Dkt. No. 48-5 at 3.)

2. <u>Defendant Singh</u>

On February 1, 2007, plaintiff attended a Unit Classification Committee (UCC) hearing to determine his eligibility for a C-side assignment. The UCC recommended that plaintiff be cleared for a C-side assignment. (Mtn. at 3; Opp. at 35.) The committee noted that plaintiff's escape "happened 29 years ago, before Electrified Fences were installed. Brook has

---

Dkt. No. 48-2 at 1-2.) Plaintiff points out that C-side is enclosed by numerous fences, heavily guarded, and that inmates are constantly monitored while on C-side. (Opp. at 2-3, 28-29; see also Dkt. 48-8 at 3.)

been assigned to Metal Fab or Bookbindery for the past 10 years without incident." (Dkt. No. 48-9.) On April 24, 2007, plaintiff attended another UCC hearing where the UCC reiterated its recommendation that plaintiff be cleared for a C-side assignment. (Mtn. at 3-4; Opp. at 35.)

Two years later, on April 3, 2009, plaintiff attended an Institutional Classification Committee (ICC) hearing to determine his eligibility for a C-side assignment.[7] (Mtn. at 3; Opp. at 35-36.) Defendants Singh and Cappel served on the ICC (Singh as chairperson), along with three other committee members. (Cmplt. at 52 (Ex. 6).) In its hearing report, the ICC stated that the review concerned "the 1978 escape and . . . if placement on a vocational training assignment waiting list is appropriate." (Cmplt. at 49-52 (Ex. 6).) The ICC set forth various departmental/Solano policies concerning escape and inmate custody designations, including the following provisions:

> "[A]n inmate who is sentenced to a lengthy sentence and who demonstrates a management concern and/or an escape history . . . shall require Close B Custody."

Title 15 section 3377.2(c)(2) (Criteria for Assignment of Close Custody). (Id. at 50.)

> Inmates designated Close B Custody and who fall within the below listed criteria are ineligible for assignments on C-Side:
>
> Life without the Possibility of Parole (LWOP)
>
> <u>20 Years or more from projected release date</u>
>
> <u>Escape with or without force or attempted escape with or without force from any correctional setting, or armed escort, will be evaluated on a case by case basis.</u>
>
> Designated Special Public Interest Case (case by case basis).
>
> Active law enforcement holds for an offense that could result in sentencing such as a LWOP, or to multiple life terms, or death.

CSP-Solano Operations Manual Supplement 52130.01.2 (emphasis added). (Id.) The hearing report stated that the ICC denied plaintiff a C-side assignment because of his 1978 escape from

---

[7] Neither party explains the lengthy delay between UCC hearings and the ICC hearing.

prison and the fact that, as plaintiff was "sentenced to a Life sentence with an additional 16 month sentence for his 1978 escape," plaintiff needed to serve 20 or more years on his commitment offense.  (Id. at 50-52.)

Plaintiff alleges that defendant Singh "knew that I had an ongoing lawsuit against the prison, and based his decision . . . on that knowledge." (Cmplt. at 9; see Dkt. No. 49-1 (letter from state legal analyst to Correctional Case Records Manager concerning preservation of plaintiff's prison records during litigation of Ronald D. Brook v. Tom L. Carey, Warden, et al, United States District Court, CIV S-04-1254 EJG GGH P).  Singh does not deny knowledge of plaintiff's lawsuit or inmate grievances in his sworn declaration; however, he denies any retaliatory motive.  (Dkt. No. 48-7.)

In response to plaintiff's Interrogatory No. 4 ("From January 1, 1997 through December 1, 2007, what were the regulations regarding life term inmates with escape histories being assigned to C-side at CSP-Solano?"), Singh responded: "The Institutional Classification Committee (ICC) would recommend that certain life-term inmates, with escape histories, be assigned to C-Side at California State Prison, Solano.  The Correctional Captain would then evaluate each of the ICC's recommendations on a case-by-case basis and either affirm or overrule the ICC's recommendations." (Dkt. No. 49-1 at 55-56.)

In response to plaintiff's Interrogatory No. 7 ("Does any life-term inmate without a parole date have a projected release date?"), Singh responded "No."  (Dkt. No. 49-1 at 57.)

3. Defendant Cappel

After the ICC informed plaintiff of its decision, plaintiff stated his displeasure with the decision and informed the committee members that he would continue to pursue that matter through the inmate grievance process. (Dkt. No. 48-6 (Cappel Decl.) at 3.)  Plaintiff alleges that "[a]t that time Defendant Cappel told the Plaintiff that if he continued to push the issue of getting his job back, the inmates on the yard who lost their jobs would blame him.  Plaintiff took Cappel's statement to be a threat on his life." (Cmplt. at 6.)

1    In his sworn declaration, defendant Cappel states:

> In response to inmate Brook's statement during the April 3, 2009 ICC hearing (that he would continue to pursue the matter of obtaining reassignment to C side through the inmate grievance process), I advised Brook that inmates with similar case factors to his were already assigned to C side and that if Brook continued to pursue an inmate appeal regarding his C side eligibility, those C side inmate-workers with similar case factors to his would lose their jobs and as a result would blame Brook, which would place Brook's safety at risk.

(Dkt. No. 48-6 (Cappel Decl.) at 3 (emphasis added).) Plaintiff alleges that defendant Cappel "intended to intimidate me and coerce me" and "caused me to fear that if I voiced my concern I would be removed from general population, as is customary treatment for a prisoner who fears for his safety." (Cmplt. at 12-13.)

C.  Analysis

As set forth above, to establish a First Amendment retaliation claim, plaintiff must show: (1) an adverse action against him; (2) because of; (3) his protected conduct, and that such action; (4) chilled his exercise of his First Amendment rights; and (5) the action did not reasonably advance a legitimate correctional goal. Rhodes, supra, 408 F.3d at 567–68.

As to defendant Miles, element (1) is met by Miles' denial of a gate pass to C-side after plaintiff had been working there without incident for many years. As to elements (2) and (3), Miles declares that he was unaware of any inmate grievance filed by plaintiff in January 2007, when Miles denied the gate pass. Plaintiff counters that

> Miles claims that he was unaware of Plaintiff's inmate grievances, but clear notification of Plaintiff's appeals and litigious actions are in the Plaintiff's Files. The Plaintiff was un-assigned from P.I.A. Book Bindery and assigned to the OEC. He was then un-assigned from OEC and assigned to the P.I.A. Book Bindery. Miles thus must have reviewed the Plaintiff's files twice.[8]

(Opp. at 10.) Thus there is a factual dispute as to whether defendant Miles knew plaintiff had

---

[8] As noted above, it is undisputed that "[a]nytime an inmate was approved for assignment, or reassignment, to a job on C-side, Defendant Miles would review the inmate's central file to ensure that granting that inmate C-side clearance would not create an escape risk."

10

filed grievances and/or a lawsuit when he denied plaintiff's gate pass in January 2007. In <u>Hines v. Gomez</u>, 108 F.3d 265 (9th Cir. 1997), the plaintiff argued that the defendant correctional officer framed him for a disciplinary violation in retaliation for his filing a grievance. A federal jury agreed. On appeal, the defendant Pearson responded that the plaintiff failed to produce any direct evidence that he knew of the grievance in question. The court of appeals upheld the jury's verdict for the plaintiff upon finding "the inference that . . . [the defendant] knew, at least to some extent, of Hines' use of the grievance system." <u>Id</u>. at 268. Similarly here, a jury might conclude that, by January 2007, Miles had learned of plaintiff's recent successful appeal from his reviews of plaintiff's central file or in the course of his job as Custody Captain.

Moreover, "timing can properly be considered as circumstantial evidence of retaliatory intent." <u>Bruce</u>, <u>supra</u>, 351 F.3d at 1288-89, citing <u>Pratt</u>, <u>supra</u>, 65 F.3d at 808. Here, the adverse action to plaintiff came only a few months after he successfully appealed the denial of his request to participate in OEC. Inconsistency with previous actions can also suggest retaliatory intent. <u>Bruce</u>, 351 F.3d at 1288-89. Here, defendants did not consider plaintiff a security risk during his nine years on C-side, but changed their mind after plaintiff successfully petitioned to take a class. No evidence suggests that plaintiff committed a disciplinary infraction in the 2006-2009 timeframe or did anything else to warrant the sudden revocation of his C-side access. See <u>Colon v. Coughlin</u>, 58 F.3d 865, 872 (2d Cir. 1995) ("evidence of prior good behavior also may be circumstantial evidence of retaliation."). Thus a genuine dispute of fact exists as to whether Miles took the adverse action because of plaintiff's protected conduct.

As to element (4), plaintiff has raised a dispute of material fact as to whether defendants' actions chilled his exercise of First Amendment rights.

As to element (5), defendant Miles argues that he had a legitimate reason to deny plaintiff access to C-side: plaintiff's successful escape from prison many years earlier. Certainly institutional regulations requiring inmates with escape histories to be carefully evaluated for C-side access further the legitimate goal of institutional security. In this particular case however,

where plaintiff had worked on C-side for nine years and done nothing new to suggest he posed a security risk, plaintiff has raised a dispute of material fact as to whether Miles had a legitimate non-retaliatory purpose in disallowing plaintiff to return to his longtime job on C-side. As the Ninth Circuit has reasoned:

> It is clear, and Bruce concedes, that prisons have a legitimate penological interest in stopping prison gang activity. [Citations.] But, if, in fact, the defendants abused the gang validation procedure as a cover or a ruse to silence and punish Bruce because he filed grievances, they cannot assert that Bruce's validation served a valid penological purpose, even though he may have arguably ended up where he belonged. See Rizzo v. Dawson, 778 F.2d 527, 532 (9th Cir.1985) ( "[P]laintiff has alleged that [prison official] Stocker's actions were retaliatory and were arbitrary and capricious. He has thereby sufficiently alleged that the retaliatory acts were not a reasonable exercise of prison authority and that they did not serve any legitimate correctional goal.").
>
> This comports with other circuits holding that prison officials may not defeat a retaliation claim on summary judgment simply by articulating a general justification for a neutral process, when there is a genuine issue of material fact as to whether the action was taken in retaliation for the exercise of a constitutional right. See Cornell v. Woods, 69 F.3d 1383, 1388-89 (8th Cir.1995); Woods v. Smith, 60 F.3d 1161, 1165 (5th Cir.1995); Smith v. Maschner, 899 F.2d 940, 948-49 (10 Cir.1990).

Bruce, supra, 351 F.3d at 1289.

Similarly, defendant Herrera took adverse action against plaintiff in January 2007, shortly after plaintiff successfully brought an inmate appeal. Herrera does not deny that he knew of plaintiff's recent inmate appeal in January 2007. For the reasons set forth above, a dispute of material fact exists as to whether Herrera acted based on plaintiff's grievance and without a legitimate penological purpose. Accordingly, the undersigned will recommend that summary judgment be denied as to defendants Miles and Herrera.

Defendant Singh was the chairman of the ICC committee that denied plaintiff a gate pass to C-side, contrary to the UCC's recommendation that plaintiff be C-side eligible. The ICC noted that plaintiff "has been assigned on numerous times in the Vocation Program in C-side, without any incidents. Additionally, C-side is protected by the Electric Fence." (Cmplt. at

50 (Ex. 6).)  In support of its decision, the ICC stated that plaintiff "is not within 20 years from a projected release date."  (Id. at 52.)  However, in response to plaintiff's interrogatories, Singh acknowledged that no life-term inmate without a parole date had a projected release date, yet "certain life-term inmates, with escape histories," were nonetheless assigned to C-side on a case-by-case basis.  Similarly, defendant Cappel acknowledged at the hearing that "inmates with similar case factors" to plaintiff's continued to have jobs on C-side.  From the record before the court, it is simply not clear why Singh and the ICC revoked plaintiff's access to C-side, in light of the UCC's contrary recommendation, plaintiff's many years on C-side without incident, the fact that other similarly-situated inmates remained on C-side, and the fact that plaintiff had done nothing to suggest that he would pose a security risk if allowed to return to his former job.  As discussed above, while the general regulations cited by defendants clearly advance a legitimate penological goal, there is a dispute of material fact as to whether defendant Singh barred plaintiff from C-side for legitimate reasons.  Thus the court will recommend that summary judgment be denied as to defendant Singh.

        As to defendant Cappel, the first issue is whether his statement to plaintiff constituted an "adverse action."  "The mere threat of harm can be an adverse action, regardless of whether it is carried out because the threat itself can have a chilling effect."  Brodheim v. Cry, 584 F.3d 1262, 1270 (9th Cir. 2009) (emphasis in original).  The threat need not be explicit or specific. Id.  Rather the question for the court is whether a reasonable factfinder could interpret the statements as "'intimating that some form of punishment or adverse regulatory action would follow.'"  See id. (quoting Okwedy v. Molinari, 333 F.3d 339, 343 (2d Cir. 2003)).  Plaintiff states that he felt that Cappel was threatening him with the prospect of being "removed from the general population, as is customary treatment for prisoner who fears for his safety."  Cappel counters that he was merely warning plaintiff about prospective harm from other inmates.  Drawing all reasonable inferences in plaintiff's favor, the undersigned finds that plaintiff has raised a genuine dispute of material fact as to this element.

For the reasons discussed above, there is sufficient circumstantial evidence of retaliation to withstand summary judgment as to elements (2), (3) and (4).

As to whether Cappel acted for a legitimate penological purpose, it is undisputed that Cappel advised plaintiff against filing an inmate grievance challenging the ICC's decision. Cappel asserts that his sole motivation was to ensure institutional security by discouraging plaintiff from doing something that could lead to inmate violence. In opposition, plaintiff has attached several sworn declarations stating that plaintiff was not at risk of being attacked by other inmates for engaging in protected activities. For example, one inmate stated:

> When I heard Captain Cappel told Ronald that he would be blamed for the losses of jobs of inmates removed from C-side, I felt that Ronald had been threatened by the Captain. I know a lot of inmates on this facility who know what is happening to Ronald because of his appeals. I do not know of anyone who will blame Brook for the loss of his job due to his litigation. . . . I believe that if Ronald Brook didn't get attacked over what the guards were saying about him already, than nobody will likely attack him for suing the guards.

(Decl. of John Card, Opp. at 80 (Ex. 3).) James Goodrun, a teacher's aide for the OEC class from 2005 to 2008, stated:

> I don't believe any prisoner would blame Mr. Brook for the loss of his job because of Mr. Brook's litigation to get his job back. Life term prisoners, both with escape histories and without escape histories, are being replaced with lower level prisoners from another facility, and no one blames those men. It is my experience and belief that the inmates on the yard will only blame Mr. Brook for the loss of their jobs if staff tells them that Mr. Brook is responsible for that loss.

(Goodrun Decl., Opp. at 83 (Ex. 4).) Donald Wimberly, a longtime worker at the PIA book bindery, stated:

> I know that Ronald Brook is suing over the loss of his job, and hope he wins for the sake of all life prisoners here. Inmates I know are supportive of Ronald Brook and his efforts to stop staff retaliation and threats. . . . No inmate I know of is going to attack Ronald Brook because of his inmate appeals or law suits, and nobody is going to attack him over what the guards do or say.

(Wimberly Decl., Opp. at 86 (Ex. 6); see also Opp. at 87-95 (Exs. 6-7 (similar declarations).) Thus, it is not clear from the record on summary judgment whether Cappel's stated reason for discouraging plaintiff from filing a grievance was grounded in institutional realities or pretextual. As there is a genuine dispute of material fact as to whether defendant Cappel acted in furtherance of a legitimate penological purpose, the court will recommend that summary judgment be denied as to defendant Cappel.

### D. Qualified Immunity

Defendants assert that they are entitled to immunity from plaintiff's retaliation claim under the doctrine of qualified immunity, which protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). As indicated above, the court finds there are genuine issues of material fact as to whether defendants retaliated against plaintiff for protected activities. Plaintiff has a clearly established right under the First Amendment to file inmate grievances and lawsuits, and not be retaliated against for doing so. Rhodes, 408 F.3d at 569-570 ("we . . . reiterate our firm recognition that 'the prohibition against retaliatory punishment is 'clearly established law' in the Ninth Circuit, for qualified immunity purposes.'"), citing Pratt, 65 F.3d at 806. Thus defendants' qualified immunity argument should be rejected at this time.

Accordingly, IT IS HEREBY ORDERED THAT the Clerk of Court shall correct the caption of this case as to defendant "V. Singh."

IT IS HEREBY RECOMMENDED THAT defendants' April 11, 2011 motion for summary judgment (Dkt. No. 48) be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned

1   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

2 shall be served and filed within fourteen days after service of the objections.  The parties are

3 advised that failure to file objections within the specified time may waive the right to appeal the

4 District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

5   Dated: January 27, 2012

                                           _____

                                           CAROLYN K. DELANEY
                                           UNITED STATES MAGISTRATE JUDGE

10  2
   broo1364.msj